BLOCK, OPPENHEIMER & CO. v. SWEENEY & COOMBS.

(Case No. 2042.)

1. DAMAGES — DISTRESS WARRANT. — Suit was brought to recover damages against an officer who had seized goods under an attachment, and the same goods were held by the same officer under distress warrant, levied for rent due for the store-house, in which the goods were exposed for sale, and where they were seized, and the amount and justness of which was admitted. *Held:*

(1) The amount for which the distress warrant was levied was a defense for the officer *pro tanto,* which amount should have been deducted from the amount of damages, if any, found.

(2) When the pleadings were sufficient to maintain such defense, in the absence of special demurrer or of instructions asked upon the point, the failure of the court to give them is not such an error as will require a reversal.

2. DAMAGES, MEASURE OF.— In a suit brought to recover damages for goods seized under attachment, and sold practically at retail some time afterwards, the court instructed the jury as follows: "If you find for the plaintiffs, find for them the fair and reasonable market value of the goods at the time and place of seizure, and eight per cent. thereon from the time of this date; such valuation, of course, not to be less than the price for which said goods were actually sold; and the amount you may so find is actual damages." *Held:*

(1) The instruction, in so far as it directed the jury to find as actual damages a sum not less than the sum the goods actually sold for, was erroneous, and under the facts misleading.

(2) That if the stock was sold by the sheriff in original packages, or in such manner as to bring the greatest price, the sum realized at such sale would be a fact to be considered with other facts in estimating the damage, but would not establish the real value of the goods sold at the time of seizure. The value at that time would form the measure of damages based on value.

3. FACT CASE.— See statement of case for facts which, on an issue involving the fraudulent sale of a stock of goods, required that a new trial should have been granted.

APPEAL from Harris. Tried below before the Hon. James Masterson.

On the 1st day of November, 1883, the appellees, Sweeney & Coombs, bought from J. S. Mills his entire stock of goods, store fixtures, etc., then in the store occupied by Mills, at Houston, Texas, and were at once placed in possession of the property purchased.

Sweeney & Coombs, according to their testimony and that of their agent, paid $2,000 cash for the goods, and in addition obligated themselves for the goods to pay L. J. Latham $2,523 owing him by Mills for rent of the store.

On the evening of the day of the sale, Block, Oppenheimer & Co. and Halff, Weis & Co. brought suit against J. S. Mills for debts owing by him, and aggregating about $3,100, and not then due, and in these suits caused attachments to be issued and levied on the entire stock of goods, store fixtures, etc., sold to Sweeney & Coombs by J. S. Mills, and then in the possession of Sweeney & Coombs. Afterwards the attaching creditors mentioned procured an order in chambers, and under this order had the property so levied on sold, and at the sale it brought $7,454.97.

Before the next term of the district court for Harris county appellees instituted this suit to recover from the attaching creditors and the sheriff the value of the property levied on and sold as above stated, the value being laid at the sum of $7,454.97. Appellees also claimed exemplary damages.

Appellants replied —

1st. A general denial.

2d. That the goods taken were taken under process of attachment issued out of the district court of Harris county, in suits of sundry parties against J. S. Mills, whose goods they were and subject to his debts. That if appellees acquired any interest in said goods before levy, they did so with the intent and purpose to defraud the creditors of Mills, who was largely indebted at the time of sale, and was actually and notoriously insolvent; and that the plaintiffs, well knowing of his being in debt and insolvent, and knowing that he transferred the property with the intent and purpose of defrauding his creditors and to put his property beyond their reach, bought it, and out of due course of trade. They set up the amount of their debts. They also pleaded that additional writs had been levied on the property, among which was one in favor of L. J. Latham *v.* J. S. Mills for $2,600, No. 11,358, in the district court of Harris county, Texas, under which likewise the property was seized and held.

Verdict for plaintiffs for $7,738.32.

Sweeney & Coombs did business as pawnbrokers in Houston, across the street from Mills. They knew that, in the summer of 1883, he was slow paying; he was sometimes slow meeting bills with plaintiffs; had bought goods from Mills several times during the spring and summer of 1883, prior to buying him out; $2,800 at one time, $500 another and $900 another time; these were bought at fifty cents on the dollar, but many of them were old goods. The last purchase made of him was about six weeks before the final sale of the entire stock.

When they bought out Mills' stock they were informed that he owed eighteen months' rent to Latham for the store he was occupying; that the rent was a lien on the stock, and they assumed to pay it.

Sweeney testified that he did not know of any debt except Latham's; did not care and did not inquire to know, and that it was none of his business.

Coombs went to Garnett & Jones to consult them about the buying out of Mills, but not because they were afraid of the transaction, only they never made a trade of that size without advice of lawyers; they did not inquire when they bought from him former lots of goods.

The proposition to sell was made in the night-time, and the *next* night Mills invited plaintiffs over to his store to see the goods and

look over the inventory, and they went there about 9 o'clock *at night*. It was not consummated that night.

The next morning, after breakfast, *Mr. Garnett*, representing Mills, went to plaintiffs and wanted to make a trade for the goods; he went over, and by 9 o'clock in the morning completed the examination of the goods, and soon afterwards *Mr. Garnett* returned and offered to sell the goods at $6,000, which was declined. In a short time Mr. Garnett went again and offered to take $5,000, which was declined, but was offered $4,500. *Mr. Garnett* returned and replied that Mills would not take $4,500. He then left, and the matter ended. In an hour or so Mr. Garnett came again and said Mills had decided to take $4,500, and they traded.

This was about 11 o'clock A. M., and between then and sundown they sold $600 worth of their goods, $517 in cash, according to Coombs' testimony.

Coombs' understanding was, at the time he bought out Mills, that he owed $1,000 besides the $2,500 owed Latham for rent, and that his reason for selling out was that he and his wife did not get along well together in the store, and he wanted to sell out, pay up and quit the business. This is what Mr. Garnett told him.

They did not. tell anybody while trading with Mills that they were about to buy him out; did not ask any of Mills' neighbors as to his solvency, nor make any inquiry of any one about it.

They knew that it is the custom in Houston to pay the rent of stores monthly.

Coombs testified that, ordinarily, when a man is eighteen months behind with rent, it would indicate that he was hard up for money to pay with.

Coombs testified that he thought they were getting the goods at fifty cents on the dollar.

They did not buy the goods to sell in their own store or replenish their stock, but as a speculation to sell out in his own store, and they did not propose to keep the store longer than was necessary to sell out their goods.

The plaintiffs testified that they regarded Mills as honest and solvent, and that they had no facts leading them to suspect his solvency.

Nine witnesses, doing business on the same block, testified that Mills was notoriously insolvent at the time he sold his stock of goods. Three others thought him solvent, one of whom knew he was hard pressed, and another had been absent in Europe most of the year. The goods sold constituted the entire property of

Mills. No provision was made for other debts, and the purchasers, instead of paying the Latham debt then due, sent him a written promise of future payment, and failed to pay it.

M. W. Garnett, a witness for plaintiffs, and one of their attorneys in the case, testified: " That for three or four years before the sale to Sweeney & Coombs, witness had been the attorney for Mills, and they had been and were friends; that Mills frequently called on witness to assist him in matters where his services were required, rather as a friend than as a lawyer; and witness, whenever he could, would assist him; that on the morning of the second day before the sale by Mills to Sweeney & Coombs, Mills came to witness' office and said he wanted to sell out, and desired witness to assist him, which witness told him he would do. Witness knew that Mills and his wife had not been getting along well together in the store, and that they had recently had serious trouble, which resulted in Mrs. Mills leaving her husband and staying away from him a short time. The impression made on witness, by his conversation with Mills on the morning mentioned, was that Mills' purpose in wanting to sell out was to quit the business and avoid further trouble with his wife. On the following morning, the plaintiff, Sweeney, called at office of witness and informed him (witness) that Mills wanted to sell out to Sweeney & Coombs, and had referred Sweeney to witness about the matter. Sweeney then asked me whether a merchant could sell out in that way. I replied to him that I was Mills' lawyer, and could not advise him (Sweeney) as a lawyer; but as a friend, I would say to him that I knew of no reason why such a sale could not be made, and that I thought it would be all right, and to go on and make the purchase if the terms suited him. Mr. Sweeney then told me to see Mills and tell him to go on and make out an invoice of what he had, and that as soon as Sweeney & Coombs could get through the business of the day and leave their stores, that they would come over to Mills' store and examine the invoice and goods. Mr. Sweeney then left, and I went down to Mills' store and informed him of the conversation between Sweeney and I. The next morning, between 8 and 9 o'clock, at Mills' request, I went over to see Sweeney & Coombs about the trade. They declined entertaining any proposition until Mr. Coombs could go over and examine the goods again by daylight, they having (according to their statement to me) examined the goods the night before. Mr. Coombs then left, as he said, to go to Mills' store to examine the goods, and I returned to my office. In the course of an hour, I went back to Sweeney & Coombs' store, where I found both

Sweeney and Coombs, and told them that Mills would take $6,000 for the stock and fixtures. They refused to give this, and said that $4,000 was as much as they would give. I then left, and after seeing Mills again, returned to Sweeney & Coombs' store, and told them that Mills had authorized me to take $5,000 for the property. This they refused to give, and after talking for some time they proposed to give $4,500 for the property. I went back and saw Mills, who refused to sell at that price. I informed Sweeney & Coombs of this, and as they refused to offer any more, I left them and returned to my office, and supposed the matter was ended. After I had been in my office some time, probably an hour, Mills came up and said he had finally concluded to take the $4,500. I then went down again to Sweeney & Coombs' store, and notified them of Mills' acceptance of their offer, and told Coombs to go and get a notary public, and come on around to Mills' store, where I would meet him. I then went to Mills' store and in a short time Coombs and the notary came in. Mills and his wife then executed and acknowledged a bill of sale, which I had already drawn up, to Sweeney & Coombs, for the stock of goods and fixtures and lease of the store, and Mr. Coombs then paid me for Mills, and in Mills' presence, for the goods, etc., $2,000 in cash, which I then and there counted and handed to Mills, and Coombs also at that time executed the obligation of Sweeney & Coombs to L. J. Latham for the payment of rent owing Latham by Mills, which was then understood to be $2,523. After the money was handed Mills, he turned it over to his wife. Immediately upon the closing of the trade, Mills turned over the store and all in it into the possession of Coombs. This was between 11 and 12 o'clock in the morning, according to my recollection.

"When Mills came to me to assist him in selling, I did not know that he was insolvent. I knew of only two debts that he owed, and I did not know whether they were paid or not. One of these debts was a claim that was in the hands of Davis & Sayles, of Galveston. According to my recollection, this claim was about $1,200 or $1,300, and was settled by Mills giving his notes on short time. I think this was in the summer of 1883. I do not know whether these notes had been paid at the time of the sale to Sweeney & Coombs or not. The other claim against Mills that I knew of was held by Mr. Archer, of Houston. I think the claim was about $200. When I went to see Sweeney & Coombs about selling them the stock, I told them that Mills owed the rent to Latham, and about $1,000 outside of that; that was what Mills told me. I further

told Sweeney & Coombs that Mills was not getting along well with his wife, and that his object in selling was to settle up and quit the business."

*Hutcheson & Carrington* and *C. Anson Jones*, for appellant, that the law requires a reversal on the undisputed facts, cited: Edmundson *v.* Silliman, 50 Tex., 111; Humphries *v.* Freeman, 22 Tex., 50; Edrington *v.* Rogers, 15 Tex., 195; Mills *v.* Howeth, 19 Tex., 257; Taylor *v.* Ashley, 15 Tex., 51; Chandler *v.* Meckling, 22 Tex., 42; H. & T. C. R. R. Co. *v.* Schmidt, 61 Tex., 286.

That the knowledge by appellees that Mills was not able to meet his engagements vitiated the sale, citing: Reeves *v.* Shry, 39 Tex., 636, 637; Chamblee *v.* Tarbox, 27 Tex., 145.

*Jones & Garnett*, for appellees, on charge of the court, cited: Powell *v.* Haley, 28 Tex., 55, 56; Fowler *v.* Waller, 25 Tex., 701; Robinson *v.* Varnell, 16 Tex., 387; Cole *v.* Cole, 17 Tex., 4; Linn *v.* Wright, 18 Tex., 340; Farquhar *v.* Dallas, 20 Tex., 200; Bast *v.* Alford, 20 Tex., 229.

That the verdict and judgment should not, under the facts established, be disturbed, they cited: Carter *v.* Carter, 5 Tex., 101 and 102.

STAYTON, ASSOCIATE JUSTICE.— The appellees claim to have purchased from J. S. Mills, on November 1, 1883, his entire stock of goods for the sum of $4,500.

There is very considerable conflict in the evidence in reference to the value of the goods, varying from $4,500 to $15,000.

The evidence of the appellees themselves shows that they were intending and thought they were purchasing the goods at about half their cost. One of them stated that "when goods were sold in bulk, as those were, fifty cents on the dollar is about as much as they ever sell for;" thus attempting to show what the fair market value was. They, however, stated that they expected to realize a larger sum for them by selling at retail.

After the goods were seized by the sheriff, they were sold under an order of the court, but at what time that sale was made does not appear. It was practically a sale in small parcels, at auction, which continued six or seven days, and thus the goods sold by the sheriff were made to bring $7,276.80.

There was a verdict and judgment for appellees for $7,728.32, for actual damages.

The court instructed the jury as follows: "If you find for plaint-

iffs, find for them the fair and reasonable market value of the goods at time and place of seizure, and eight per cent. per annum interest thereon from that time to this date; such valuation, of course, not to be less than the price for which said goods were actually sold; and the amount you may so find is actual damages."

This charge was erroneous and misleading.

The first part of the charge was correct, and gave the true measure of damages in an action for the conversion of goods. Blum v. Thomas, 60 Tex., 161; Tucker v. Hamlin, 60 Tex., 174.

The latter part of the charge was erroneous, and under the facts misleading.

The sale was made at some time subsequent to the seizure and practically at retail, and could not be made the measure of damages.

The value of the goods may have increased between the time of seizure and of sale.

Interest, in addition to the market value at the time and place of seizure, is the compensation to which a person in an action of this kind is entitled.

If between the time of seizure and sale the property depreciates in value, that cannot affect the right of the person whose property has been illegally converted; and if it increases in value, that fact cannot affect the amount of the recovery.

If a stock of goods seized be sold in original packages, or in the manner in which a sheriff, acting for the best interests of the parties interested, would ordinarily sell, the price which they brought at such a sale would be a fact to which a jury might look, in connection with other facts in evidence, for the purpose of ascertaining the value of the goods at time of seizure; but this would be but a fact, not establishing the minimum or real value of the thing sold.

The charge given precluded the jury from finding that the goods at time of seizure were of value less than they sold for at a subsequent period.

That there may have been a preponderance of evidence, in the opinion of the court below or in the opinion of this court, tending to show that the verdict of the jury was not excessive, does not obviate the objection, for there was evidence from which the jury might have found that the goods at the time and place of seizure were not of value equal to the sum for which they were subsequently sold.

Some of the charges asked by the appellants contained a correct legal proposition, but they each would have been charges upon the weight of evidence, and the court correctly refused to give them.

It is true, if the property was seized by the sheriff under a distress warrant issued at the suit of Latham for rent due to him from Mills, which Sweeney & Coombs failed to pay, after having agreed to do so, as a part of the price of the goods, that such seizure, so far as made to secure that debt, would operate as a defense to the sheriff; for to that extent the seizure would be legal whether the sale to Sweeney & Coombs was fraudulent or not.

No damages could result to them from such seizure, admitted to be valid and secured by lien on the goods to enforce which the seizure was made.

The appellees could not recover from the sheriff or the other appellants, in any event, such sum as may be paid, on the debt due to Latham, out of the proceeds of the goods seized; otherwise they would recover the full value of the goods seized, and at the same time have a part of the proceeds applied to a debt which they were personally bound to pay, and secured by a lien on the goods fully recognized by them at the time they purchased.

If the pleadings and evidence were sufficient to enable the appellants to maintain this defense, and without critically examining that question we may say that, in the absence of a special demurrer, the pleadings were probably sufficient, then the appellants should have asked a charge upon this subject.

This was not done, and the judgment could not be reversed for the sole reason that the court failed to give a charge upon that subject, when not asked to do so. The failure to give such a charge no doubt led to an excessive verdict, which gives to the appellees a sum which the facts show they were not entitled to, if entitled to a verdict at all. The excessive character of the verdict, in view of these matters, was urged in the motion for a new trial.

The appellants also sought a new trial, on the ground that the evidence did not authorize the finding that the sale made by Mills to Sweeney & Coombs was not made with intent to defraud the creditors of the former with full knowledge of that fact by Sweeney & Coombs.

We have carefully examined all the evidence in the case, and feel constrained to say that the undisputed facts are of such a character as to have required the court below to grant a new trial. Edmundson v. Silliman, 50 Tex., 112; Chandler v. Meckling, 22 Tex., 42; Humphries v. Freeman, 22 Tex., 50; H. & T. C. R'y Co. v. Schmidt, 61 Tex., 285.

The evidence renders it as certain and clear as such a question can be made that Mills was insolvent, and that he made the sale to

Sweeney & Coombs for the purpose of defrauding his creditors, and that such was their situation and past course of dealing with him, that it is impossible for an unbiased mind, in view of all the facts in the case, to avoid the conviction that Sweeney & Coombs knew of his fraudulent purpose and assisted him in it.

In view of the fact that the cause will have to be remanded, it is not deemed proper to analyze or comment upon the evidence found in the record.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered February 27, 1885.]