### ALEXANDER et al. v. HARRIS.*
#### (No. 10229.)

(Court of Civil Appeals of Texas. Fort Worth. May 5, 1923. Rehearing Denied June 9, 1923.)

**1. Trusts ⬤⟞105—Sale of children's equities in community homestead property constitutes fraud, and creates constructive trust.**

Sale by a father, of legal title to community property, in disregard of children's equities, constitutes fraud against the children, rendering him liable as constructive trustee.

**2. Trusts ⬤⟞356(1)—Purchaser of community homestead in fraudulent sale of equities by surviving husband held substitute trustee.**

Where the father bought homestead property with community funds, and after the death of his wife sold his legal title, disregarding the equities of three surviving children, such sale was a fraudulent conversion of the equities constituting the purchaser with notice a substitute constructive trustee.

**3. Trusts ⬤⟞356(1)—Purchaser from constructive trustee, with notice of equities, liable to beneficiaries for price.**

Where the surviving husband sells the community estate, in violation of his children's equities, the children as cestuis of a constructive trust may elect to take the proceeds of a sale of their interests from the purchaser with knowledge.

**4. Election of remedies ⬤⟞3(4)—Cross-action to recover land held not to bar recovery of proceeds of sale.**

Equitable part owners by inheritance of a community homestead, who sought by cross-action to recover their land from an innocent purchaser seeking to quiet title, did not thereby waive the right to pursue the proceeds of sale received by the purchaser's vendor.

**5. Vendor and purchaser ⬤⟞229(1)—Purchaser chargeable with constructive notice that date of deed is subsequent to vendor's marriage.**

A purchaser of lands charged with the equitable interests of children is chargeable with constructive notice of the dates showing that title was acquired by the husband subsequent to marriage, especially where manual possession for inspection is given.

**6. Vendor and purchaser ⬤⟞244—Evidence held sufficient to constitute notice to purchaser of equitable claims to land as matter of law.**

Evidence *held* sufficient to show constructive notice to purchaser of equitable rights, as a matter of law.

Appeal from District Court, Erath County; J. B. Keith, Judge.

Suit by Marie Alexander and another against John G. Harris. Judgment for defendant, and plaintiffs appeal. Reversed and rendered.

Thompson, Barwise, Wharton & Hiner, of Forth Worth, for appellants.

A. P. Young and Chandler & Pannill, all of Stephenville, for appellee.

DUNKLIN, J. H. C. Alexander and Miss Lizzie R. Shelby were married on August 3, 1901. Prior to their marriage, H. C. Alexander had acquired an undivided one-third interest in 160 acres of land situated in Erath county, known as the W. W. Jones survey. After their marriage and during the marriage relation, Alexander acquired the remaining undivided two-thirds interest in the 160-acre tract and also 10 acres out of an ad-

joining tract, which was a part of the Jesse Van survey, and the two tracts were occupied and used as the homestead of the family during the existence of the entire marriage relation, which continued from August 3, 1901, until the death of the wife, which occurred January 15, 1907. Three children were born of that marriage, to wit, Marie, born September 23, 1903, Lucille, born February 18, 1905, and an infant who, together with the mother, was burned to death on January 15, 1907. The undivided two-thirds interest in the 160-acre survey and the 10 acres out of the Jesse Van survey, both of which were purchased during the marriage with community funds, became the community property of the husband and wife, while the undivided one-third interest in the 160-acre survey, which was purchased before the marriage, was the separate property of H. C. Alexander.

The record shows that if there were any community debts owing at the date of the death of Mrs. Alexander, the same were paid out of the community funds, and that there was no administration or necessity therefor either upon the community estate or upon the estate of Mrs. Alexander. After the death of Mrs. Lizzie Alexander, H. C. Alexander continued to live upon the land as his homestead, together with his two minor children, Marie and Lucille, until August, 1917, when he left it temporarily and remained away until he sold the same to John G. Harris on November 23, 1917, for the sum of $2,600 cash in hand paid, about one-half of which consideration was applied by Harris, who was president of the Dublin National Bank, to the payment of two debts then owing by Alexander, one of which was in favor of that bank and the other in favor of a sister of Mr. Harris. Alexander was joined in that deed by Mrs. Lula F. Alexander, to whom he was married in December, 1914. On the 11th of September, 1918, John G. Harris sold the land mentioned above to John J. Adams for a consideration of $3,500. Thereafter, John J. Adams instituted suit to remove cloud from his title to the land in which Marie and Lucille Alexander were made parties defendant. A guardian ad litem was appointed by the court to represent those two defendants, who were minors. The guardian ad litem, in addition to defensive pleadings to plaintiff's suit, filed a cross-action in which he sought to recover of the plaintiff for the minors, their mother's community interest in the land. To that cross-action plaintiff filed a plea of innocent purchaser, and upon that plea the minors were denied a recovery on their cross-action and by the judgment rendered in that case full title to the property was decreed to be vested in the plaintiff Adams.

After the rendition of that judgment, Marie and Lucille Alexander, through their father, H. C. Alexander, as next friend, instituted the present suit against John G. Harris, the vendee of their father, to recover the sum of $5,000, alleged to be the reasonable market value of their interest in the land, which they alleged was converted by Harris by reason of the facts recited above, which were alleged in their petition, or, in the alternative, for the sum of $1,750, with 6 per cent. interest thereon from September 11, 1918, the date when the defendant sold the land to Adams; said amount being alleged to be the proceeds received by Harris from the sale of the plaintiffs' interest in the land.

As shown in plaintiffs' pleading the theory upon which they sought to recover one-half of the proceeds of the sale of the land to Adams was that H. C. Alexander, their father, held title to the interest owned by the plaintiffs as trustee for them; that, at the time defendant purchased the land from their father and at the time he sold the same to Adams, he knew of the community interest of their mother in the land, and knew that such interest had been inherited by plaintiffs as her children, and therefore, he, likewise, became a trustee in equity for plaintiffs, and was liable to them for the proceeds of the sale of the interest so held by him in trust for them, and which interest he sold to an innocent purchaser who, by reason of being such, acquired title to such interest.

The statement of facts contains the following:

"Now at the close of the testimony, the plaintiffs, not having introduced any testimony as to the present value of the land, now elect to seek a recovery and an accounting for one-half the purchase price received by Mr. Harris (defendant) in the sale to Mr. Adams, with 6 per cent. interest thereon from the date of said sale."

The trial was before the court without a jury, and judgment was rendered denying plaintiffs a recovery, from which judgment plaintiffs have prosecuted this appeal.

The essential and primary basis for the relief claimed by plaintiffs in the alternative prayer in their petition is the contention urged both in their pleadings and in briefs here that, upon the principles of equity, the father, H. C. Alexander, held title to their equitable interest in the land in trust for them, that the defendant purchased that title with notice of their interest, and thereby became a substitute trustee in place of their father, and having sold the same to an innocent purchaser and thereby deprived them of a recovery of the property, he is liable to them for the proceeds of the sale received by him.

In the able brief filed by counsel for appellee, many authorities are cited to sustain the contention that H. C. Alexander and the two children were tenants in common only, and that the relation of trustee and cestui que

trust did not arise by virtue of the fact that he held the legal title to the property, and there were no community debts to be paid by the sale of it. Some of those authorities are Miller v. Miller, 34 Tex. Civ. App. 367, 78 S. W. 1085, writ refused; Wingo v. Rudder, 103 Tex. 150, 124 S. W. 899; Wiess v. Goodhue, 98 Tex. 274, 83 S. W. 178. In those cases the issue involved was whether or not the statute of limitation applied in favor of a survivor of the material relation as against heirs suing to recover the community interest of their mother, which they inherited from her upon her death, and in those decisions, and others which might be added, it was held that the survivor and the heirs were tenants in common, which relation did not preclude the survivor from invoking the statute of limitation after adverse possession was claimed by him and notice of such adverse claim brought home to the heirs. In other words, the substance of those decisions was to the effect that no such relation of trustee and cestui que trust existed between the surviving father and the children as would preclude him from claiming title under the statute of limitation when the proper predicate for such claim was laid. Other authorities containing statements to the effect that the surviving parent holding legal title to community property is not a trustee for his children, who inherited their mother's community interest therein with respect to the issues therein discussed, are noted in the opinion of Chief Justice Conner of this court in the case of Hand v. Errington, 233 S. W. 567. Appellee also insists that there was no resulting trust in the land in controversy in favor of the plaintiffs, because there was no fiduciary relationship existing between them, citing in support of that contention Dickerson v. Abernathy, 1 Posey, Unrep. Cas. p. 107. It is insisted further that there was no constructive trust because there was no proof of fraudulent intent upon the part of the father of the plaintiffs in the sale of the land to the defendant Harris, or on the part of Harris in his sale to Adams, and in support of that contention the following authorities are cited: Block, Oppenheimer & Co. v. Sweeney & Coombs, 63 Tex. 419; Beach v. Dyer, 93 Ill. 295; Ussery v. Ussery, 113 Ark. 36, 166 S. W. 946; 39 Cyc. pp. 170, 171.

[1] It cannot be denied that the equitable title of the appellants in the land was wrongfully converted and the title thereto was lost to them through no fault on their part. Such conversion was a fraud in law, whether intended or not. H. C. Alexander, as the holder of appellants' unrecorded equitable title through the legal title to all interest in the property, was the constructive trustee for appellants, and as such trustee he was liable to appellants for a conversion of that interest. That such is true we deem to be con-clusively settled by the decision of the Commission of Appeals, in the case of Hand v. Errington, 242 S. W. 722. In that decision the following is a part of a quotation made and cited with approval from 3 Pomeroy's Eq. Juris. vol. 3, p. 2397, par. 1051:

"A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. * * * It is not essential for the application of this doctrine that an actual trust or fiduciary relation should exist between the original wrongdoer and the beneficial owner. Whenever one person has wrongfully taken the property of another, and converted it into a new form, or transferred it, the trust arises and follows the property or its proceeds."

[2, 3] If H. C. Alexander was the constructive trustee for appellants by reason of the fact that, as holder of the legal title, he had the power to convert their interest to his own use by selling the same to an innocent purchaser, then the defendant Harris, by reason of his purchase of the same title from H. C. Alexander and clothed with the same power, was likewise a substitute trustee for appellants, and charged with the same duties and liable to appellants to the same extent if he converted appellants' interest by sale to an innocent purchaser, and if it be true, as alleged by appellants, he had notice of their title at the time he purchased the property from their father. And if appellants had such right of action against the substitute trustee they had the right at their option to sue for the purchase money received by appellee for such conversion. Eastham v. Sims, 11 Tex. Civ. App. 133, 32 S. W. 359; 1 Perry on Trusts, § 317; Newman v. Newman, 60 W. Va. 371, 55 S. E. 377, 7 L. R. A. (N. S.) 373, and other decisions there cited; Davis v. Dickerson, 137 Ark. 14, 207 S. W. 436; Black v. Caviness, 2 Tex. Civ. App. 118, 21 S. W. 635; Home Inv. Co. v. Strange (Tex. Civ. App.) 152 S. W. 514; Sullivan & Co. v. Ramsey (Tex. Civ. App.) 155 S. W. 586. In the case of Mansfield v. Wardlow (Tex. Civ. App.) 91 S. W. 859, the following was said:

"A person who purchases an estate, although for a valuable consideration, with notice of a prior equitable right, makes himself a mala fide purchaser, and will himself even be held a trustee for the benefit of the person whose right he sought to defeat. Pom. Eq. Jur. § 659."

In the case of Skaggs v. Mann, 46 W. Va. 209, 33 S. E. 110, it is said: "When a party has acquired" merely "the legal title to property" held in trust with notice thereof "equity will convert him into a trustee of the true owner." See, also, 39 Cyc. p. 548.

[4] It is insisted further by appellee that appellants, under the equitable doctrine of election of remedies, waived their right to recover the purchase money received by ap-

pellee for the sale of their interest in the land to Adams, since in the suit by the latter against them for title they, by cross-action, sought to recover their equitable title and prosecute such cross-action to a final judgment, which was adverse to them. We overrule that contention, since it is well settled that the doctrine invoked applies only as between inconsistent remedies or demands; and to make them inconsistent one action must allege what the other denies, or the allegations in one action must necessarily repudiate or be repugnant to the other. Such cannot be said of appellants' two actions, the first, to recover the land, and the second, to recover the proceeds of the sale of it, since both actions were based upon the theory that title to the property was held in trust for appellants. 20 Corpus Juris, pp. 9, 11, 19. 21, 25, and 26. Nor does the doctrine apply when the two actions are against different persons and are consistent with each other. 20 Corpus Juris, pp. 8 and 17.

The further contention is made by appellants that the evidence conclusively showed that appellee had notice of their equitable title in the land at the time he purchased the same from their father, and that the judgment of the trial court should be reversed and judgment should be here rendered in their favor for the amount of the purchase money realized by appellee for appellants' interest when he sold the same to Adams, an innocent purchaser.

[5] All the deeds under which H. C. Alexander acquired title were duly recorded, and those deeds which purported to convey an undivided two-thirds interest in the 160-acre tract and entire title to the 10-acre tract all bore dates which were subsequent to August 3, 1901, the date of H. C. Alexander's marriage to Miss Lizzie R. Shelby, who afterwards became appellants' mother. Appellee was chargeable with constructive notice of the dates of those deeds, and the evidence further shows that manual possession of the originals was delivered to appellee for inspection before he made the purchase from H. C. Alexander.

[6] It was shown by uncontroverted proof that H. C. Alexander had lived in Erath county more than 40 years; that he and appellee, Harris, had been well acquainted with each other for a number of years prior to the purchase of the land by Harris, and during which acquaintance Alexander resided about four miles from Dublin, where Harris lived, and where he was engaged in business, first as a railroad telegraph operator and later as a banker; that Alexander did business with the Dublin National Bank, of which Harris was president; that Harris was also acquainted with Alexander's father and with Mr. Shelby, the father of Mrs. Lizzie R. Alexander. Appellee testified on the trial, in part, as follows:

"I knew Mr. Alexander after I went into the banking business. I might probably have known him when I was in the railroad business. I knew his father, and Tom Alexander. I did not know his wife. I remember the circumstances of her death; I recollect one of his wives burned to death. I remember the circumstances. I remember about a little child getting burned up at the same time. I didn't know about her having any other children except the one who got burned. I did not know that she had two other little girls. I never was at his house. He lived there in about four miles of Dublin. * * * I consider Mr. Alexander thoroughly honorable. He has paid debts that were barred by limitation that I know of; I trusted him, but I had no idea that a thing of this kind would come up. I bought this land in absolutely good faith. I relied upon what he stated. I took the deed conveying whatever land it describes. I in turn sold the same land to Mr. Adams. I got pay for it. I collected $3,600 for it and paid the agent $100 to make the trade. I received the $3,500 recited in the deed. That is the same land I acquired from Mr. Alexander. I didn't know when I took this deed from Mr. Alexander that his deceased wife had two little girls. I didn't know it until I took the deed. I knew nothing about the female portion of the family. I never went to the records to examine the dates these deeds were made; I didn't have my agent to do it. Mr. Brown was my representative in the matter. I don't know whether Mr. Brown examined the deeds or not. Mr. Brown had some deeds at the time he made the transfer. I am quite certain Mr. Brown did not examine the records to ascertain the dates of the respective transfers to Mr. Alexander of this land. I did not require him, as my agent, to do that. I never asked him to do that. I was willing to risk whatever information that came to him and to me. He was my agent. There was nothing said about him examining these instruments to see when they were made; that is, these conveyances to Mr. Alexander. I saw Mr. Alexander bring up a bundle of papers. I told Mr. Brown to draw up those deeds. I was too busy to look into the deeds. I didn't look for the marriage license. I didn't look at the deeds. I did not go to any records. We depended upon Mr. Alexander's statement to us. I made no investigation at all of the title; I made no investigation at all of the records. If Mr. Brown did I don't know it. I don't know it if Mr. Brown discovered in his investigation that these deeds were all made to Mr. Alexander subsequent to the date of his marriage. Very likely if I had gone to the records I would have found that that was the truth. * * * I didn't know a thing in the world about his children. He made some representations to me before I made the agreement with him to buy this place and pay him $2,600 as to whether it was his separate property. He stated that he earned his money prior to his marriage to his first wife. He stated to me that this money that he had earned that he paid for this land prior to the time that he was married to this woman. He said his father owed him the money, and that he had already paid his father for the land, but that he didn't get a deed to it until after he married. He told me. that Judge Keith told

him he could make a good title to the land. I relied on his statements to me. That was the reason I made no investigation of the title, I knew him to pay a note that was barred by limitation. At the time I bought this property I believed I was getting a good title to it. Mr. Brown advised me that the title was all right. Alexander advised me that he had gone over the matter with Judge Keith, and Judge Keith advised him that he had a right to sell it. I thought I knew the value of the land at that time; $2,600 was a fair market value of the land at that time. I kept that land, and the only thing I ever got from it was a quart of blackberries, and a bale of hay. I did not have Mr. Brown to examine the title. I hired Mr. Brown to draw up the deeds. I was so certain that we had been rightfully informed I didn't look into anything. At the time I purchased this property I had no intention to defraud these plaintiffs. I didn't know any female members of Mr. Alexander's family except his last wife, she had been in the bank. * * * I had all the deeds, but I am no attorney."

Henry E. Brown, referred to in defendant Harris' testimony, was introduced by Harris as a witness and testified, in substance, that he was employed by Harris to draw the deed from Alexander to him, but not to pass on the title, that he was told by Alexander before the consummation of the trade that the deeds to him to the property in controversy were executed after his marriage to his former wife, who was dead, but that the property was paid for by funds acquired by him before his marriage, and that he communicated that information to Harris. These statements were not contradicted by Harris in his testimony. Brown further testified:

"I probably made the statement that these two children (appellants) had no interest in the place. I made that statement to Mr. Harris as coming from Mr. Alexander. We talked about Mr. Alexander having some children. He did not tell me he knew about these children. I don't know whether he indicated that he did know anything about the children or not. I thought and Mr. Harris thought that if Alexander actually acquired the land and paid for it before his marriage that it would be his separate property. I think Mr. Harris concluded that along with me. * * * I was not exactly representing Mr. Harris, only as a friend. I thought I was friendly to them both."

Independently of testimony of Alexander, tending strongly to support a recovery by appellants, the testimony quoted above was sufficient, as a conclusion of law, to put Harris on notice of appellants' interest in the land he was buying from their father, notwithstanding his confidence in the honesty of Alexander and his belief in the truthfulness of his statement to the effect that he had paid for the property in controversy before his marriage to the mother of appellants. Harris had both actual and constructive knowledge that the deeds of conveyance through which Alexander claimed title were executed during the existence of that marriage relation. He was chargeable with knowledge that that fact made the property, presumably, community property of Alexander and his former wife, according to our statutes. While he testified that he did not know that Alexander had any children by his former marriage, other than the infant who was burned to death, he did not testify that Alexander told him that there were none other. The information which he says was conveyed to him by Alexander, that the property was the separate property of the latter because he purchased it before his marriage, and his reliance thereon, was strongly suggestive that there were then living children of that marriage. It cannot be denied that by proper inquiry Harris would have learned of those children, if in fact he did not know of their existence, and he could not deprive them of their equitable title to an interest in the property on the plea of innocent purchaser, by relying on the statement of their father that he had paid for the property out of funds acquired by him before his marriage to their mother. Burleson v. Alvis, 28 Tex. Civ. App. 51, 66 S. W. 235; Standford v. Finks, 45 Tex. Civ. App. 30, 99 S. W. 452; Bass v. James, 83 Tex. 110, 18 S. W. 336; W. C. Belcher Land Mortgage Co. v. W. P. Clark et al. (Tex. Civ. App.) 238 S. W. 685 (writ of error denied), and decisions there cited.

From the foregoing conclusions, it follows that the judgment of the trial court must be reversed, and, since proof of constructive notice to appellee of appellants' equitable title to an undivided interest in the land at the time of his purchase from their father was conclusively established by the testimony of appellee himself, in connection with the records of the deeds through which Alexander deraigned title, aside from the further testimony of his own agent and witness, Brown, judgment will be here rendered in favor of appellants for the sum of $1,536.48; same being the proceeds of the sale of their interest in the property received by appellee from his vendee Adams, plus interest thereon from the date of said sale up to the present time, at the rate of 6 per cent. per annum, and also for costs of suit in this court and in the trial court; and this judgment will draw interest from its date at the rate of 6 per cent. per annum.

Judgment reversed and rendered.