INTERNATIONAL & GREAT NORTHERN RAILROAD COMPANY v.
IRA C. IVES.

Decided December 16, 1903.

**1.—Railway—Injury at Crossing—Contributory Negligence.**

Evidence of traveler on highway in a wagon struck by a train at a railway crossing considered and held sufficient to support a recovery involving a finding of due care on his part.

**2.—Same.**

Evidence of circumstances, the extent to which the view was obstructed, and the comparative speed of the train and of plaintiff's wagon considered, and held not to so conclusively disprove his statement that he looked for the approaching train without discovering it as to require a reversal of a verdict in his favor.

**3.—Contradicting Witness—Evidence on Former Trial.**

Evidence of plaintiff on former trial as to care used in approaching a railroad crossing held not to contradict his present version to the extent of requiring it to be discredited.

**4.—Crossing—Contributory Negligence—Question of Fact.**

The care required of a traveler on a highway in approaching a railway crossing must necessarily be left to the judgment of a jury, unless the evidence discloses clearly a lack of ordinary care.

Appeal from the District Court of Travis. Tried below before Hon. Geo. Calhoun.

*S. R. Fisher, J. H. Tallichet,* and *N. A. Stedman,* for appellant.

*Hogg, Robertson & Hogg* and *Z. T. Fulmore,* for appellee.

STREETMAN, ASSOCIATE JUSTICE.—Appellee recovered judgment for personal injuries sustained at a public crossing on defendant's railroad. This is the second appeal, a former judgment having been reversed on account of an erroneous charge. International & G. N. Ry. Co. v. Ives, 71 S. W. Rep., 772.

The negligence alleged on the part of appellant was the failure to give the statutory signals for the crossing. The verdict, under the charge of the court, implies a finding that appellant was guilty of the negligence alleged, that appellee was free from contributory negligence, and that appellee was injured to the extent found by the verdict.

The only question made by the assignments of error is the sufficiency of the evidence to sustain the finding upon the issue of contributory negligence. It is not claimed that there was error in the manner in which this issue was submitted to the jury, but it is strenuously urged that the evidence was so conclusive as to require the court to give a peremptory charge for defendant upon this issue; or, at least, that the verdict was so clearly against the preponderance of the evidence as to entitle appellant to a new trial.

The accident occurred at about 11 o'clock at night, October 19, 1901. Appellant was alone driving a two-horse wagon along a public road a few miles north or northwest from Austin. Attempting to cross appel-

34 Civ.—4

lant's railroad, his horses were struck by a locomotive, drawing a passenger train. He was thrown from the wagon and very seriously injured.

At the place of the accident the railroad runs nearly north and south, and the wagon road runs about east and west, but not exactly at a right angle to the railroad. Appellee was going in a westerly direction, and the train which struck him was going north; so that in approaching the crossing his left side was to the train, but his face would be slightly to the north.

There was no timber on the right of way, but beginning on the east side of it, and just south of the wagon road, there was a piece of timbered land, which prevented appellee from seeing down the railroad to the south, until he came within about 120 feet of the track. The track was straight for several hundred yards south of the crossing. There was a switch beginning about 100 feet from the crossing, and extending south several hundred feet. There was a cut which began about 100 feet from the south end of this switch, and extended south several hundred yards. The evidence is conflicting as to the depth of this cut, and as to the height of the dirt which had been taken from it and piled on the sides of the track. Appellant's witnesses testified that it was not deep enough to have obstructed the view of an approaching train. A witness for appellee, however, testified that "at the north end of the cut, the distance from the rail to the top of the embankment is about seven feet." There was a mile post, which a map introduced by appellant shows to have been about 1200 feet south of the crossing. The same witness testified that "right at the mile board the cut is about seven feet deep. * * * At the next telegraph post it is about eight feet deep; at the next one about nine feet, and later on about eleven feet high."

Appellee had only one eye, having lost his left eye. He testified as follows:

"Approaching the crossing that night, I was driving in a jog of a trot. I was sitting on the spring seat on the double bed on the wagon, and driving in a slow jog of a trot. I was driving a pair of good Spanish horses; I was wide awake and duly sober. I had not drank anything stronger than coffee during that day. When I first got to the corner of the timber, just sufficient to see the switch to the left, I threw my eye to the left; I could see four or five hundred yards down south on the railroad right of way; when I looked in that direction I didn't see anything, nor did I hear anything. I was listening, as I was always accustomed to do when it was after night. I was listening for a bell and whistle of the train as it went out, and if I didn't hear any train, then I expected if it was train time to find it on that switch, but there was nothing on the switch; I saw nothing and heard nothing. I had been in the habit of traveling over that road ever since the road was built. I always understood that the trains had to blow a steam whistle and ring a bell at least eighty steps of a public crossing. I didn't hear any signal, and when I got to where I could see by the timber and see the

end of the switch I looked down at the switch. There was nothing on the switch and I heard nothing. There is a curve some 200 yards north of there, and when the south-bound train comes you can't see it until it comes around that curve, and I then threw my eye to the right and there was nothing between me and the curve, and about that time I saw the glare of light on the track. When I discovered the light on the track I had proceeded nearly to the track, my horses were within five or six feet of the track, and they saw the train and endeavored to run by, on across the railroad the way they were headed, and the train didn't look to me to be over sixty or seventy steps or a hundred feet from me at that time. The train was coming from Austin, and it looked to me like it was shot out of a gun, that was my idea of it. 1 threw my weight on the lines and tried to back my horses, but my right-hand horse reared on his hind feet and lunged, and I don't think I made over two hauls on my line before the cow catcher was under my horse. I thought, well, I'm a dead man. If I turned my lines loose it would throw me right under the engine, and I thought my only show was to back them. I thought if I turned my lines loose they would carry me in front of the engine before I could quit my wagon, but I thought I could back them before the engine passed. The last I recollect was when the cow catcher went under my horses. It threw me with much violence and so high and so far that I never knew where I struck, only what I have been told since."

If this testimony of appellee was true, we think it can not be doubted that it was sufficient to sustain the finding of the jury that appellee was not guilty of contributory negligence. It shows that appellee was expecting danger from the north, and that his attention was therefore directed mainly to that point; but it further shows that he did not wholly fail to look to the south. It also shows that he was relying to some extent upon the statutory signals to warn him of the approach of a train from the south; and the finding of the jury, which is not assailed, warrants us in assuming that such signals were not given. Under these circumstances, the verdict ought not to be disturbed, unless the other evidence in the case is sufficient to discredit his testimony, and to show that he did not in fact use the vigilence to which he testifies. Carraway v. Railway Co., 6 Texas Ct. Rep., 524; Texas & P. Ry. Co. v. Fuller, 36 S. W. Rep., 319; Railway Co. v. Slattery, 3 House of Lords Law Rep., p. 1155.

It is insisted, however, that the other facts in evidence do discredit his testimony, and show that if he had looked, as he claimed, he would certainly have discovered the approaching train; and that under the circumstances he must have been either drunk or asleep, or absolutely careless of his own safety in driving upon the crossing.

It is not necessary to determine where the burden of proof rested upon the issue of contributory negligence. The plaintiff having testified to facts which would warrant the finding that he was free from contributory negligence, before we would be authorized to disturb their

verdict it would be necessary for us to say that the other undisputed evidence in the case disproved his statement. This is, in effect, appellant's contention. It is based mainly on the fact that the track south of the crossing was straight for a great distance; that the engine had an electric headlight, and that there was no obstruction that could have prevented appellee from seeing it, if he had looked, as he claimed he did, as he entered upon the right of way. To maintain this contention, however, we must assume that there was no obstruction to prevent appellee from seeing the train or the headlight, when he claims to have looked in that direction, and from the evidence above set out, this must depend upon the distance of the train from the crossing at that time.

Appellee when he says he looked south was about 120 feet from the crossing. He reached the crossing at the same time as the engine. If we knew precisely the speed at which he was traveling, as well as the speed of the train, we could determine the location of the train at the time he claims to have looked; but the evidence is by no means conclusive either as to his speed or that of the train. Appellee testified that he was traveling at a "jog trot." The engineer testified: "My train was traveling about twenty-five miles an hour; don't think it was traveling about thirty-five miles an hour." Appellant assumes that a jog trot is about four miles an hour, and taking the engineer's estimate of twenty-five miles an hour as correct, argues that the train must have been only about six times as far from the crossing as appellee; that is, about 700 feet, and the evidence showing that the headlight of the engine is about ten feet high, insists that if plaintiff had looked, he must certainly have seen the headlight of the engine.

It is plain, however, that this evidence is not so conclusive as to warrant us in rejecting the evidence of appellee that he did look and did not see the train.

The engineer also testified that the statutory signals were given, but upon this point he was contradicted and the jury did not credit his statement. It is altogether possible that his estimate of the speed of the train was incorrect, and that it may have been running at forty to forty-five miles an hour, instead of twenty-five miles. Appellee's statement is that it looked like it was "shot out of a gun." While this language is highly figurative, it is, nevertheless, expressive of a very high rate of speed. On the other hand, we do not feel authorized to assume that a jog trot is four miles an hour. It may have been somewhat less.

As the ratio increases between the speed of the train and appellee's wagon, the distance of the train from the crossing at the time appellee entered upon the right of way correspondingly increases; and from the facts we have mentioned, it does not seem impossible, or indeed improbable, that when appellee claims to have looked to the south the engine may have been 1300 to 1500 feet south of the crossing; and if so, the evidence shows that, in all probability, the view would have been obstructed by the depth of the cut at that point.

It is further insisted that the light from the headlight itself shining

down the track would have afforded sufficient notice of the train, and that appellee could not have failed to see it, if he had been looking; but we are unable to say that the evidence is so conclusive upon this point as to compel the jury to discredit appellee's positive statement.

It is also contended that appellee himself, upon a former trial, testified that he not look to the left, and that his testimony on that point ought not now to be believed. If it clearly appeared that appellee, upon a former trial, had deliberately testified in contradiction to his testimony upon this trial, we should hardly feel warranted in affirming the judgment upon his testimony. A case of that character occurred in Missouri P. Ry. Co. v. Somers, 78 Texas, 441. In this case, however, appellee denies that he so testified, and from the stenographer's notes of his testimony, which were introduced by appellant, it appears that he probably did not intend to make that statement. He says that he wanted to explain his testimony at that time, and was not offered an opportunity to do so; and the record upon the former appeal in this case shows that he offered, after the close of the evidence upon the first trial, to return to the stand and testify to the facts stated on the last trial, but was not permitted to do so. The case as now presented is very similar to that of Texas & P. Ry. Co. v. Fuller, 36 S. W. Rep., 319, in which it was said:

"It is true, this court reversed this case upon the former appeal upon the ground that the evidence showed that Mrs. Fuller was guilty of contributory negligence. The record then before us showed that Mrs. Fuller herself testified that she went upon the track without a thought of danger, and without looking or listening, and with her head wrapped in a nubia covering her ears. Upon the last trial, Mrs. Fuller testified that her testimony was not correctly given in the statement of facts used upon the former appeal, and she affirmatively testified that she did both look and listen before going upon the railroad, and neither saw nor heard the engine. She further testified that the nubia was thrown loosely over her head, and it was light, and its meshes so large as not to obstruct her hearing. Her testimony denying the correctness of the statement of her evidence as contained in the former statement of facts was sought to be impeached by the testimony of witnesses that she did testify on the former trial that she did not look or listen before entering the track. This issue of the credibility of the witness was peculiarly the province of the jury to settle, and the verdict settled it in favor of Mrs. Fuller. Unless there is some inherent reason in her testimony itself for setting it aside as untrue, or unless some other conclusively established fact demonstrates the falsity of her testimony, we must, in deference to the verdict, accept it as true."

We have carefully considered all the evidence in the record, as well as the authorities cited and the able argument of appellant's counsel, but we have reached the conclusion that we would not be justified either in reversing and remanding the case or rendering judgment for appellant. What will constitute ordinary care on the part of a person

approaching a railroad track at a public crossing must necessarily be left to the judgment of a jury. How far he may rely upon his sense of hearing and the giving of signals required by law, to what extent he must exercise caution in looking for approaching trains, and to what extent he has used his senses of sight and hearing in the particular case, are matters peculiarly within the province of the jury. Where the evidence discloses clearly a lack of ordinary care, we should not hesitate to set aside their verdict, but where acts of caution are testified to, and the other evidence does not conclusively discredit such testimony, their finding is conclusive. We are not called upon to determine what our judgment would have been if the evidence had been presented to us in the first instance. Two juries have passed upon the issue of contributory negligence in this case, and two judges of the district court have refused to set aside their verdicts, and we are unable to say that their conclusion is manifestly against the evidence.

The judgment is therefore affirmed.

*Affirmed.*

Writ of error refused.