## HERD v. WADE et al.
### No. 3911.

Court of Civil Appeals of Texas. Amarillo.
June 28, 1933.

Rehearing Denied Sept. 13, 1933.

C. H. Cain, of Tahoka, and Bean & Klett, of Lubbock, for appellant.

G. H. Nelson, of Tahoka, and Bledsoe, Crenshaw & Dupree, of Lubbock, for appellees.

HALL, Chief Justice.

Mrs. Wade, a feme sole, sued Herd and J. M. Pope, alleging, in substance, that Herd was the owner and operator of a private bank conducted under the name of Southland Bank, Unincorporated, in the town of Southland, in Garza county. That he was at the same time cashier of the First National Bank at Post, in said county; that he lived at Post, which was the county seat, and had one W. M. McHorse in charge of the bank at Southland, and on or about September 25, 1929, he secretly sold said bank to Pope without advising or giving the depositors notice of the sale; that McHorse was interested in a fire insurance agency in connection with the bank, and also sold his interest in the agency to Pope; that, after Pope acquired the bank, McHorse remained there several days, and later left the town of Southland; that on or about December 2, 1929, the bank became insolvent and closed its doors; that there were about three hundred customers of said bank whose deposits amounted to about $50,000.-00; that plaintiff was also a customer and depositor and at the time of such sale had a balance of $586.55, which amount she sought to recover.

Defendant, Herd, answered by general demurrer and general denial, and in addition thereto set up special defenses of election, estoppel, ratification, novation, and that plaintiff was negligent in not removing her account when she had an opportunity to do so.

He further alleged that the sale of the

bank building and premises, together with fixtures, notes and accounts and the business to Pope was made in good faith for a valuable consideration; that Pope assumed all liabilities to the depositors, including plaintiff; that there was no agreement or intention on his part to keep the sale a secret, and the fact of such sale was a matter of common knowledge in the community; that plaintiff knew of such sale immediately thereafter, and the deed, bill of sale, and assumed name certificate were promptly filed and recorded in the office of the county clerk at Post, in Garza county; that immediately after Pope purchased the bank and took possession he was pointed out to plaintiff as the man who had bought it; that plaintiff discussed with her son whether she should withdraw her account, and elected to keep her deposit with the new banker; that she ratified the sale, and under the circumstances is estopped to say she did not recognize Pope as the one liable to her for said account; that there was a novation implied from the facts and circumstances by which she accepted and treated Pope as the due debtor in lieu of the old debtor; that, as a legal consequence, Herd was released from liability; that, if she elected to keep her money on deposit with Pope, and neglected to draw it when she had an opportunity to do so, the loss was due to her own negligence; that, when the bank was closed and Pope became a fugitive from justice, she and practically the other three hundred depositors took action to have a receiver appointed to take charge of the bank property, as that belonging to J. M. Pope, and such action was taken by a committee duly appointed by the depositors and authorized to take such steps as they thought proper to have Pope arrested and their money remitted; that, notwithstanding the efforts of plaintiff and such depositors to recover their money from Pope, they took no action to recover the same from Herd and made no demand on him for the payment of their deposits.

It is asserted that more than two hundred depositors have filed suits to recover their money.

The case was submitted to the jury upon twelve special issues, and, upon the return of the verdict, the court rendered judgment in favor of Mrs. Wade against Herd for $586.55, that being the amount of her deposit.

The appellant attacks practically all of the findings of the jury. The special issues, together with the answers, are as follows:

"No. 1. Do you find from a preponderance of the evidence that between September 25, 1929, and December 2, 1929, the plaintiff received notice or information sufficient to cause inquiry or investigation by a person of ordinary prudence as to whether John T. Herd had sold the Southland Bank to J. M. Pope?" Answer: "Yes."

"No. 2. Do you find from a preponderance of the evidence that at the time of, or immediately after the transaction relative to a sale of the Southland Bank by John T. Herd to J. M. Pope, that it was agreed by and between John T. Herd, J. M. Pope and W. M. McHorse that such transaction would be kept secret?" Answer: "Yes."

"No. 3. Do you find from a preponderance of the evidence that subsequent to September 25, 1929, and prior to December 2, 1929, W. M. McHorse made statements to customers of the Southland Bank to the effect that John T. Herd had not severed his connection with the Southland Bank?" Answer: "Yes."

"No. 4. Do you find from a preponderance of the evidence that John T. Herd, prior to December 2, 1929, learned that W. M. McHorse was making the statements inquired about in the preceding special issue?" Answer: "Yes."

"No. 5. Do you find from a preponderance of the evidence that John T. Herd, after learning of the making of such statements by W. M. McHorse, exercised such diligence as an ordinary prudent person would have exercised under the same circumstances to correct such statements?" Answer: "No."

"No. 6. Do you find from a preponderance of the evidence that the plaintiff, between September 25, 1929, and December 2, 1929, caused an inquiry to be made of W. M. McHorse as to whether John T. Herd had severed his connection with the said Southland Bank?" Answer: "Yes."

"No. 7. Do you find from a preponderance of the evidence that in answer to such inquiry that the said W. M. McHorse made the statement in effect that John T. Herd had not severed his connection with the Southland Bank?" Answer: "Yes."

"No. 8. Do you find from a preponderance of the evidence that the said statement of W. M. McHorse in effect that John T. Herd had not severed his connection with the Southland Bank was made known to plaintiff and that she relied and acted thereon and by reason thereof kept her deposit in said Southland Bank and continued doing business in said bank until it was closed?" Answer: "Yes."

"No. 9. Do you find from a preponderance of the evidence that the plaintiff used such diligence as a person of ordinary prudence would have used under the same or similar circumstances to discover whether the Southland Bank had been sold by John T. Herd to J. M. Pope?" Answer: "Yes."

"No. 10. Do you find from a preponderance of the evidence that if the plaintiff had used

such diligence as a person of ordinary prudence would have used under the same circumstances that she would have discovered that John T. Herd had sold the Southland Bank to J. M. Pope in sufficient time to withdraw her money before the bank closed?" Not answered.

"No. 11. Do you find from a preponderance of the evidence that at any time between the 25th day of September, 1929, and the second day of December, 1929, the plaintiff had knowledge that the defendant John T. Herd had sold the Southland Bank to J. M. Pope?" Answer: "No."

"No. 12. Do you find from a preponderance of the evidence that the plaintiff accepted the said J. M. Pope as the one liable to her for her deposit in lieu of John T. Herd?" Not answered.

The first proposition urged is that the trial court erred in changing the venue of the case from the county of defendant's (Herd's) residence to Lynn county.

■ In the matter of changing the venue, the trial court has a wide discretion, and the appellate court will not reverse such action unless it clearly appears that the trial judge has abused his discretion.

R. S. art. 2170, provides that the venue of a civil case may be changed upon the application of either party supported by his own affidavit and that of at least three credible persons for any of the following causes: (1) That there exists in the county where the suit was pending so great a prejudice against him that he cannot obtain a fair and impartial trial; (2) that there is a combination against him instigated by influential persons, by reason of which he cannot expect a fair and impartial trial; (3) for other sufficient causes to be determined by the court.

■ The record shows that Garza county is sparsely settled and contains not more than six hundred citizens qualified for jury service; that the bulk of the population was in the vicinity of Post, the county seat, and of the village of Southland, where the bank in question was situated, and that the qualified jurors living in the vicinity of Southland, comprising about one-fourth to one-third of the total available jurors in the county, were disqualified; that Southland is the center of the best agricultural part of Garza county, and is thickly settled within a radius of ten miles around that village. It further appears that, of the remaining two-thirds or three-fourths of the citizens qualified to sit upon juries, ninety-five had theretofore been used either as talesmen or jurors in the first and second trials, resulting in mistrials; that, of the four hundred to four hundred fifty citizens qualified for jury service who did not live within the vicinity of Southland, a large number were customers of appellant's bank,

and were indebted to him or to his bank for past and present financial favors; that a majority of the qualified jurors in the vicinity of Post, approximating 35 per cent. of the population, were biased in favor of the appellant, Herd; that the two juries selected at the two former trials had come from the various communities in the county, and, after returning to their homes, had discussed the case with their friends and neighbors; that it was the most famous and notorious civil case which had ever been tried in the county, because of the fact that appellant, Herd, was very popular, had been referred to as the financial daddy of the county, and stood high in social, civic, and financial circles; that during the first and second trials the courtroom was packed and jammed with people from all sections of the county who manifested an intense interest in the outcome of the suit; that it was discussed at mail boxes, country schoolhouses, gins, and country stores, and had been a chief topic of discussion for nearly two years prior to the time the application for change of venue was heard.

The trial judge was evidently of the opinion that, by reason of the widespread discussion and notoriety of the case, and the fact that a great majority of the citizens had formed and expressed opinions and were in sympathy with one side or the other, the chances of getting a fair and impartial jury required a change of venue.

More than forty witnesses testified upon the hearing of the application, and it is apparent from their testimony that, on account of the fact that appellant, Herd, was a very popular man, that many of the prospective jurors were indebted to either him or his bank, they would be strongly biased in his favor. As one witness expressed it: "Where a banker was involved who had been a lot of help to the country and had accommodated many people in the country, it would be mighty hard to get a juror to go against him."

It appears that on the first trial the jury panel consisted of forty-six men. Six of these were excused on the ground of sickness or other reason not stated. Four were excused because they had either formed or expressed an opinion relative to the merits of the case. Of the remaining thirty-six members of the panel, twenty-four did business with appellant's bank. Eight were not customers of that bank, and four made no statement as to which of the two banks in Post they patronized. Of the twelve jurors selected on this first trial, seven did their banking with the appellant's bank in Post, four did not, and one made no statement. The three jurors who hung the jury on the first trial were customers of appellant's bank.

There were forty-nine members of the jury

panel at the time of the second trial. Thirteen of the forty-nine were excused on account of having formed or expressed an opinion, and three were excused because they had been summoned as witnesses. Of the remaining thirty-three, there were twenty-nine who were regular customers of appellant's bank at Post. Twenty-one of that twenty-nine were indebted to the bank at that time. Of the twenty-nine, six had heard part of the former trial, but testified they had formed no opinion. Two testified they had heard part of the first trial, had formed an opinion, but could lay it aside. Fourteen testified they had heard the case discussed a great deal, but had formed no opinion. Of the twelve men selected as jurors, seven were customers of appellant's bank at Post, and six of them were indebted to said bank. Four had heard the case discussed but had formed no opinion. Another had heard a great part of the first trial, had formed an opinion, but said he could lay it aside.

The two panels combined comprised ninety-five men, three of whom were excused as witnesses, six for reasons other than having formed an opinion, seventeen were excused on account of having formed opinions.

All of the witnesses introduced upon the hearing of the application for change of venue were in behalf of appellee. Appellant put no witnesses on the stand to rebut any of the testimony offered by appellee.

The appellant testified that he had been the managing head of his bank at Post for approximately sixteen years; that his bank and the Citizens' Bank of Post were the only two institutions of the kind in Garza county since the Southland Bank had closed its doors; that his bank, which was the First National Bank, had between twelve hundred and fifteen hundred depositors, and the Citizens' Bank had six hundred to seven hundred fifty; that the average daily deposits in his bank were between $250,000 and $260,000, and in the Citizens' Bank from $50,000 to $60,000; that at the time of the trial his bank had about two hundred sixty loans on their books, the majority of them being to people in Garza county; that the depositors in the defunct Southland Bank consisted of a majority of the jurors in the Southland section. He testified that upon the former trials the courtroom was filled with people, and they were standing along the sides of the walls; that during the argument spectators filled the space inside the bar except just enough for the attorneys to move around; that the sheriff had to place a rope from the door leading out of the courtroom into the district judge's office so as to keep the people in the corridors back and allow the lawyers passageway to get out of the courtroom; that there were people present from Justiceburg, Pleasant Valley, Hackberry, Cross

Roads, Grassbur, Ragtown, and other communities; that between three hundred fifty and four hundred people attended the two former trials.

In the light of this array of facts, we think the trial judge would have abused his discretion if he had overruled the application for a change of venue. Ferguson Seed Farms v. McMillan (Tex. Com. App.) 18 S.W.(2d) 595, 63 A. L. R. 1009; Trimble v. Burroughs, 41 Tex. Civ. App. 554, 95 S. W. 614, 615; Trammell v. Currie (Tex. Civ. App.) 261 S. W. 827; Crawford v. Wellington Railroad Committee (Tex. Civ. App.) 174 S. W. 1004.

Appellant's (Herd's) second proposition is that the court erred in not peremptorily instructing a verdict in his favor because (as he asserts) the pleadings and admissions of Mrs. Wade show she did not withdraw her deposit or transfer her account after she learned that Pope had purchased the bank from Herd, and because it is further shown that she would depend on Pope for payment and the court erred for the further reason that she subsequently caused the appointment of a receiver to take charge of the bank as the property of Pope.

This proposition is duplicitous, but we have decided to consider it.

■ The record does not seem to support the proposition, in so far as it asserts that Mrs. Wade has admitted that she knew Pope had bought the bank and is therefore estopped. The appellant read from the stenographic report of her testimony on a former trial in an effort to show that she had testified that she knew Pope had purchased the bank and acquired such knowledge between the time of the purchase and prior to the date when the bank closed its doors. She denied making the statements read from the stenographic report, and testified on this trial positively that she did not know it. If it be admitted that she had made inconsistent statements and that her positive testimony on a former trial was in conflict with her testimony upon this trial, nevertheless the court would not have been justified in directing a verdict. The credibility of a party who testifies is for the consideration of the jury, though he has made contradictory statements, for the jury may believe one part of a party's testimony and refuse to believe another. Funk v. Miller (Tex. Civ. App.) 142 S. W. 24; Williams & Chastain v. Laird (Tex. Civ. App.) 32 S.W. (2d) 502; Clem v. Fulgham (Tex. Com. App.) 14 S.W.(2d) 812; Heierman v. Robinson, 26 Tex. Civ. App. 491, 63 S. W. 657; I. & G. N. Ry. Co. v. Ives, 34 Tex. Civ. App. 49, 78 S. W. 36; Melburn v. Webb (Tex. Civ. App.) 277 S. W. 800, 801.

■ The record tends strongly to show that the receiver of the bank was appointed upon suggestion of Herd, and that such suggestion was made at a time when the three members

of the committee appointed to represent the citizens had visited Herd at Post and called upon him in behalf of the depositors for their money, insisting that he was responsible for it. His reply was that maybe something would be worked out whereby he could take over the bank and he would let them know later about it, and stated: "The main thing to do is to get a receiver appointed as quickly as possible." Neither member of the committee, according to their uncontradicted testimony, ever saw the application for receivership. But, if it had been shown that the application for receiver had been made by Mrs. Wade, or with her express authority, and with full knowledge of all the circumstances and conditions surrounding the failure of the bank, there would be no election of remedies, because, where the proceedings are against different persons and are consistent with each other, the doctrine does not apply. Alexander v. Harris (Tex. Civ. App.) 254 S. W. 146.

■■ The fact that Pope had purchased the bank and assumed Herd's obligations to all the depositors would not discharge Herd from liability without the express consent of the depositors, nor would they be estopped from proceeding against Herd jointly with Pope. The record fails to show any ratification of the sale by Mrs. Wade, because there can be no ratification without full knowledge of all the facts and circumstances.

Under such circumstances, the court would have erred in directing a verdict for either party.

By his third proposition the appellant insists that the response of the jury to special issue No. 2, to the effect that Pope, Herd, and McHorse agreed to keep the sale of the bank a secret, is without any evidence to support it.

Pope testified that there was such an agreement, so we cannot assent to this proposition.

■■ By the fourth proposition the appellant asserts that the answer of the jury to said special issue No. 2 is contrary to the overwhelming weight of the evidence.

Appellant contends that the fact that Herd executed a deed transferring the bank building and premises to Pope and at the same time executed a bill of sale transferring the personal property, notes, and accounts, which were immediately recorded, and that an assumed name certificate was made and signed by Pope showing that the bank was being conducted and operated by him, rebuts the idea that there was ever any secret agreement. We cannot assent to this proposition. These papers were filed and recorded at Post, the county seat, about twenty miles from Southland, the site of the defunct bank. The law required the execution of these instruments in order to make the transfer, but it is a significant fact that the assumed name statute, R. S. art. 5925, required Herd, when he disposed of his interest in the bank, to file with the county clerk of Garza county a certificate, duly acknowledged, setting forth the fact that he had disposed of the bank to Pope. Herd did not comply with this requirement of the law, and he may have filed the deed and bill of sale and at the same time have entered into the agreement to keep the fact of the sale of the bank and its assets secret. The testimony is that Herd, Pope, McHorse, and Connell were present when this agreement was made. It is questionable whether the recordation of these papers charged any depositor with notice of the sale. The general rule is that the registry of an instrument conveying property is notice only to those bound to search for it, such as subsequent purchasers under the grantor in a deed. Depositors are not purchasers. 20 R. C. L. 354, § 17; White v. McGregor, 92 Tex. 556, 50 S. W. 564, 71 Am. St. Rep. 875; Leonard v. Lumber Company, 110 Tex. 83, 216 S. W. 382.

■ It is shown that, though Herd carried the assumed name certificate to Post with him and filed it with the clerk, it did not remain in the clerk's office, but was delivered to Pope soon after it was filed, and was not returned to the clerk's office until the bank closed. As we understand the law, it was the duty of Herd, upon the sale of the bank to Pope and his withdrawal from the business, to give actual notice to the depositors and customers with whom he had dealt prior to the sale. Thompson v. Harmon (Tex. Com. App.) 207 S. W. 909; 20 R. C. L. 963, 964; Gilbough v. Stahl Bldg. Co., 16 Tex. Civ. App. 448, 41 S. W. 535. If the statements of the numerous witnesses who testified as to statements made by Herd, Pope, and McHorse are true, Mrs. Wade would not have learned anything if she had made inquiry directly of each of these parties, since all three made evasive and misleading answers when questioned by the several witnesses.

Herd continued the case twice on account of the absence of Connell, who is stated in his application for continuance to be a material witness, and, although Connell was present at one trial and knew whether such an agreement had ever been made, Herd did not introduce him as a witness. He testified that McHorse was his friend, had had charge of the bank for him, and yet McHorse was never introduced upon this important issue upon which Herd and Pope were in direct conflict. Pope's testimony was some evidence. The appellee introduced numerous witnesses who testified that Herd told each of them after the sale and before the bank became insolvent that he was still connected with it, that Pope was in there managing it, and stated more than once: "We will run the bank just like we have always run it, only we have got a new man in there." This was the sub-

stance of the testimony of eight witnesses, and Herd did not deny the facts to which they testified.

Miss Alice Hord, an employee of the bank at the time of the sale and until its doors were closed, testified that Herd brought Pope to where she was and said that Pope had bought out McHorse's insurance business and would remain there as cashier in the bank; that she would stay there, as she knew the people and the people knew her, and Pope was a new man; that neither Herd nor any of the others told her that the bank had been sold to Pope; that Herd came to the bank two or three times between the day of the sale and December 2d, and would look over the general ledger, note case, etc., as he had always done prior to September 25th; that she did not learn until after the bank had closed its doors that Herd had sold his interest to Pope.

Numerous witnesses testified that McHorse and Pope had frequently made statements to them which, in effect, denied that the bank had been sold and led them to believe that Herd was still the owner thereof.

We think the preponderance of the evidence shows that there was an agreement to keep the sale a secret.

■ By the fifth proposition it is insisted that the affirmative answer of the jury to special issue No. 3 to the effect that between September 25, 1929, and December 2d, McHorse made statements to customers of the Southland Bank to the effect that John T. Herd had not severed his connection with the Southland Bank was not binding upon Herd because there was no evidence that the statements were made with the authority of Herd or with his knowledge and consent.

This contention is without merit. If there was an agreement to keep the fact of the sale a secret, then all parties to the agreement were authorized and expected to deny that there had been a sale and each was bound by statements made by the others in carrying out the plan and scheme agreed upon. 22 C. J. 764, § 859; 9 Tex. Jur. pp. 400–403; 20 Tex. Jur. pp. 512–516.

What is here said also disposes of the sixth proposition.

■ By the seventh proposition, the appellant contends that the affirmative answer of the jury to special issue No. 4, in effect that Herd learned prior to December 2, 1929, that McHorse was making statements inquired about in special issue No. 3, is without any evidence to support it, in that there is no testimony that Herd learned that McHorse was making statements inquired about in special issue No. 3.

If there was an agreement to keep the matter secret, and the jury so found, and McHorse was authorized to deny the fact of the sale, then special issue No. 4 and the answer thereto are immaterial.

Nevertheless, the record shows that, according to Herd's admissions, he knew McHorse was making the statements as contended. His testimony is as follows:

"Q. You say you did hear in a round about way that your friend W. M. McHorse was telling the people up there at Southland that you were still behind this bank? A. I heard something to that effect.

"Q. And you heard it before the bank closed? A. I do not remember whether I did or not."

Counsel then asked him if upon the first trial he did not testify that before the bank was closed and after the sale that he heard in a roundabout way that McHorse and Pope were telling folks up there that he was connected with the bank and that this question was asked him: "State whether or not that during the time Mr. Pope did operate and before he left, that you had information from any source that Mr. McHorse was telling the depositors and people of Southland seen in that bank that there had been no change in ownership at all and that you made this answer: 'I heard it in a round about way. Mr. McHorse did not tell me that he was telling that, as I recall.'" After reading the foregoing question, counsel then asked Herd: "Q. Did you not make this answer to that question? A. Yes, I remember that question and answer and I made it something like that and that was true."

Then counsel for appellee interrogated the witness as follows:

"Q. Now, you did testify on the former trial that you had heard before Mr. Pope ever left that Mr. McHorse was still telling those people at Southland that you were behind the bank? A. Yes, sir.

"Q. And that was the truth? A. I suppose it is.

"Q. You were not trying to mislead anybody there on the former trial? A. No, sir.

"Q. After you heard that, you knew then that Mr. McHorse was misleading these people at Southland? A. If I heard it I paid no attention to it. I hear a good many things I do or say that I pay no attention to.

"Q. And after you heard that did it ever occur to your mind that possibly the customers and friends of yourself in that bank would be misled by Mr. McHorse's statements? A. No, sir.

"Q. You never made any effort to correct it? A. No, sir.

"Q. You did not call up McHorse, and tell him to stop telling lies about you? A. No, sir."

We think this is more than a scintilla of evidence tending to show that Herd learned before December 2d that McHorse was making the alleged statements.

What is here said also disposes of the eighth and ninth propositions.

By his tenth proposition the appellant attacks the finding of the jury in response to the sixth special issue as insufficient to form the basis of a judgment, because, as appellant asserts, there is no evidence that Herd knew, or had reason to believe, that plaintiff had caused inquiry of or had obtained information from McHorse as to whether the defendant, Herd, had severed his connection with said bank.

The evidence supports the finding, and, while it may not be necessary to plaintiff's recovery for her to have inquired of McHorse whether Herd still owned the bank, the finding, if error, is harmless.

What we have heretofore said disposes of the eleventh, twelfth, and thirteenth propositions.

In disposing of the fourteenth proposition, it is sufficient to say that the plaintiff used all necessary diligence in an effort to ascertain whether Herd had severed his connection with the bank. She testified that she relied on McHorse's statement that Herd was still in the bank. It is further shown that she requested her son, Corbett Wade, to make inquiry, and that Baisinger, at his request, asked McHorse if there had been any change in the ownership, and McHorse replied: "No, there has been no change. It is just like it has always been, except Mr. Pope has bought out my insurance business and taken my job just like I took it from Roy Stevens." McHorse's statement was communicated by Baisinger to Corbett Wade, who communicated it to his mother.

■ Appellant requested the court to submit special issue No. 12, as follows: "Do you find from a preponderance of the evidence that the plaintiff accepted the said Pope as the one liable to her for her deposit in lieu of John T. Herd?"

This was submitted and was not answered. The fact that the jury, in response to special issue No. 11, had found that appellee had no knowledge prior to December 2, 1929, of the sale of the bank, rendered an answer to special issue No. 12 unnecessary.

This disposes also of the contention under the eighteenth proposition that the court erred in refusing to ask the jury: "Did the plaintiff accept the said J. M. Pope as the one liable to her for her deposit in lieu of J. T. Herd?"

The court refused to submit the following special issues requested by Herd relating to the receivership, and it is insisted that this is error:

"(2) Did plaintiff agree to or recognize the appointment of a committee, including J. D. Hord, E. M. Baisinger and S. W. Gregory, to take such action as they considered proper to protect the depositors of the Southland bank?

"(3) Did the committee, after it learned of the alleged sale to Pope, obtain a receiver to take charge of the Southland bank property?

"(4) Did the plaintiff, through the alleged action of the Committee in obtaining a receiver to take charge of said property of the Southland Bank, thereby affirm the alleged sale of the Southland bank to J. M. Pope?

"(5) Did the plaintiff through the alleged action of the alleged committee in obtaining a receiver to take charge of the property of the Southland bank, thereby elect to hold J. M. Pope liable instead of J. T. Herd?"

■ The issue numbered 2 is immaterial, and, if it had been submitted and answered in the affirmative, it could not have affected the plaintiff's right to recover under the facts shown in the record. It does not appear that the committee took any action further than to call upon Herd to pay off the indebtedness of the bank to the several depositors and creditors and that the receiver was appointed upon suggestion of Herd. As heretofore stated in this opinion, the appointment of the receiver was not inconsistent with her effort to collect from Herd.

■ The requested special issues No. 4 and 5 submitted questions of law, and were properly refused. This is also true of requested special issue No. 6, which was refused.

By his twenty-first proposition, the appellant insists that the court erred in refusing to grant a new trial because of the improper, inflammatory, and prejudicial argument of plaintiff's attorney in stating to the jury in the closing argument that John Herd was the man who robbed the Southland people of $67,000, and that he could not blame the depositors if they had taken their shotguns and butcher knives and gone to John Herd's bank for the purpose of demanding their money back.

R. S. art. 2237, provides that, if either party during the progress of a cause is dissatisfied with any ruling, opinion, or other action of the court, he may except thereto at the time said ruling is made or announced or such action taken, and at his request time shall be given to embody such exception in a written bill. The article further announces the rules for preparation and filing bills of exception in such cases. Subdivision 5 provides that the party taking the bill shall reduce it to writing and present it to the judge for his allowance and signature, and subdivision 6 provides that the judge shall then submit the bill to the adverse party or his counsel, and, if found to be correct, shall sign it without delay and file it with the clerk. Subdivision 7 is as follows: "If the judge finds such bill incorrect, he shall suggest to the party or his counsel, such cor-

rections as he deems necessary therein, and if they are agreed to, he shall make such corrections, sign the bill and file it with the clerk."

Subdivision 8 provides: "Should the party not agree to such corrections, the judge shall return the bill to him with his refusal indorsed thereon, and shall prepare, sign and file with the clerk such bill of exception, as will, in his opinion, present the ruling of the court as it actually occurred."

The final subdivision is: "Should the party be dissatisfied with said bill filed by the judge, he may, upon procuring the signatures of three respectable bystanders, citizens of this State, attesting to the correctness of the bill as presented by him, have the same filed as part of the record of the cause; and the truth of the matter in reference thereto may be controverted and maintained by affidavits, not exceeding five in number on each side, to be filed with the papers of the cause, within ten days after the filing of said bill and to be considered as part of the record relating thereto."

The appellant, Herd, prepared a bill of exception to remarks made by one of the attorneys for appellee in his closing argument to the jury. The remarks are set out in the bill, as follows: "Talk about J. M. Pope stealing money from the Southland bank! Who started this stealing? I will tell you who started it. John Herd started it. There he is (turning and pointing scornfully to the defendant John T. Herd). John Herd is the man who robbed the Southland people of $67,000.00 trust funds when he turned the Southland bank over to a man he had never heard of and did not know whether he was a hijacker or some man out of the oil fields. This business of bankers robbing depositors is happening too often in this country. Look at what happened at such places as Plainview, Slaton and Seminole. Such business has got to be stopped. If it can not be stopped one way it ought to be stopped another. I will tell you the God Almighty's truth, I could not blame the depositors in such case from taking their shotguns and butcher knives and going to John Herd's bank and demanding their money back. I think I could not have blamed them for it."

The court refused to approve this bill, and without the consent of appellant wrote his qualification thereon. Under the rules the court should not qualify a bill without the consent of the party presenting it. Jolley v. Brown (Tex. Civ. App.) 191 S. W. 177. He states in his qualification that plaintiff's counsel objected to the argument upon the ground defendant's counsel was out of the record, and further states: "In arguing the case defendant's attorneys have argued that in a great measure the determining of the case depended upon what testimony should be taken. On the one hand that of J. M. Pope, confessedly a felon and now a convict, or on the other hand that of J. T. Herd, a banker of good reputation."

We see nothing improper in that argument. The bill further recites that defendant's attorneys had argued "that the acts of the depositors in not rushing to see J. T. Herd immediately on the closing of the bank would evidence that J. T. Herd was correct in his testimony and that the depositors knew this is evidenced by their failure to go and see him and that they regarded J. M. Pope as the man solely responsible." We see nothing improper in that argument, and it certainly did not justify plaintiff's attorney, by way of retaliation, in saying that he would not blame the depositors from taking their shotguns and butcher knives and going to John Herd's bank and demanding their money. The court states in his qualification that he does not remember the exact language used by counsel for plaintiff in his argument, some of which argument was in strong terms, but in his qualification he states merely his recollection of the gist of the argument; that, in answering the defendant's argument, plaintiff's "counsel stated that an analysis of the case showed that Herd was equally culpable with Pope and the fact of his being a banker made him no better than any other banker and the fact that he sold the bank out to Pope under the circumstances as shown by the evidence, not knowing whether Pope came out of the oil fields or was a hi-jacker, that he was equally culpable with Pope and that relative to the depositors failing to rush to see Herd that he would not have blamed them if they had done this, but that the circumstances as shown by the evidence in this case showed that they acted in the most reasonable manner and not in an extreme manner, which counsel stated that personally he would not say he would have blamed them for it if they had done so."

Appellant's counsel refused to accept the bill of exceptions as qualified by the court.

The court then prepared a bill which recites in part that, while George W. Dupree, plaintiff's attorney, was making the closing argument to the jury, Judge Klett, defendant's attorney, objected to certain arguments upon the ground that they were outside and contrary to the record. The bill further recites:

"Be it further remembered that in arguing the case Judge Klett stated to the jury that in a great measure the case must be decided from the testimony of two men. One John Pope who stole the money from the bank, who was a confessed felon, and who was now in the penitentiary, and the other John Herd, a reputable citizen and banker. In closing the case Mr. Dupree used pretty strong language relative to this. The Court being unable to remember and state verbatim

his language, but it being, in substance, that he would tell or state who, in fact, started or was responsible for such stealing. That it was John Herd for he made it possible by turning over the Southland bank to John Pope, a man who he said he had never heard of and did not know whether he was a hijacker or some man out of the oil fields.

"Be it further remembered that Judge Klett had said to the jury that the evidence showed that only a very few of the large number of depositors in the bank had ever gone to see or spoken to John Herd relative to the matter, either after the failure of the bank, thereby evidencing that they did not look upon John Herd as being responsible and that if they had so looked upon him, they would have been rushing to see him.

"Again in his argument Mr. Dupree used strong language relative to this argument of Judge Klett, stating to the jury, in substance, that he could not have blamed the depositors if they had gone en masse with guns and bowie knives to see John Herd and demanded their money back, but they did not so act, but called a meeting of the depositors, selected a committee, who represented them, and this committee had made demands for the money and they should not be criticized for adopting this course. Mr. Dupree also referred in some manner to bankers at other places, probably Plainview, Slaton and Seminole, but I have no definite recollection as to this portion of the argument, none of these matters having been called to my attention during the trial of the case, but thereafter about the 26th day of April, 1932, defendant mailed to me for my approval and signature his bill of exceptions."

The court's bill further says that he presented the appellant's bill to the attorneys for plaintiff, who presented him objections which he copies in full in his bill, and then proceeds:

"And it being my opinion that said bill of exceptions [defendant's bill] did not completely and correctly state the matters as therein complained of, I called attention of defendant's counsel thereto by qualifying said bill [copying his qualifications in full] and returned said bill with said qualifications to the attorneys for the defendant and on May 26, 1932, the attorneys for the defendant wrote me that they objected and excepted to my said qualifications," which were noted on the bill.

Subdivision 9 of the article above quoted clearly provides that the original bill presented by the complaining party, and which the court refused to approve, is the bill which should be converted into a bystanders' bill by the signature of three respectable bystanders and supporting affidavits, and we think this is the practice contemplated by R. S. art. 1838, relative to the same matter, and the courts so hold. Rabb v. E. H. Goodrich & Son, 46 Tex. Civ. App. 541, 102 S. W. 910; Shook v. Shook (Tex. Civ. App.) 145 S. W. 699.

Appellant did not convert his original bill into a bystanders' bill, as contemplated by statute, but prepared and had filed by the clerk a separate bill, which was sworn to by six bystanders. This bill sets out the remarks made by Dupree in the same language as recited in the original bill, but adds thereto considerable matter not found in the original bill. The added matter, however, makes the bystanders' bill more severe than the original bill, and we may reasonably presume that the court would not have approved it. We strongly incline to the opinion that the original bill which the court refused to sign is the one which the statutes contemplate shall be converted into a bystanders' bill, but, because the court would probably not have signed the second bill, it becomes immaterial.

Since, as stated by the trial judge, he could not remember the exact language used by plaintiff's counsel in his argument, the bill is of very little assistance to us in determining the matter.

After the bystanders' bill had been presented to appellee's counsel, they prepared a controverting affidavit thereto, as provided by said subdivision 9, which was sworn to by five citizens of Lynn county. In this bill they set out the argument of Judge Klett contrasting Pope as a felon and convict with Herd, a banker of good reputation, and his argument to the effect that the failure of the depositors to rush to Herd and demand their money, showing that they regarded Pope as the man solely responsible, and then sets out the answer to these arguments by Dupree, as follows: "George W. Dupree, in closing the argument, stated that an analysis of the case evidenced that Herd was equally culpable with Pope and the fact of Herd's being a banker made him no better than anyone else nor any other banker from Plainview, Slaton or Seminole."

The bill sets out that Dupree, in response to Klett's statement that the depositors did not go to see Herd in a body, said: "Personally I think I could not have blamed them under the testimony in this case if they had taken their shotguns and butcher knives and gone to John Herd's bank and demanded their money back, but they did not do this and they are being criticized by the defendant's lawyers because they did not."

This is clearly not a retaliatory statement. The record fails to show that Judge Klett criticized them for failing to take shotguns and butcher knives and visit Herd in a mob. The controverting affidavit further sets out what impression Dupree's argument made upon the affiants, which we think is unimportant.

We think, and several courts of civil appeals have held, that a bystanders' bill should be prepared at the time of the occurrence, though the affidavits controverting and maintaining the truth of the bill, not to exceed five in number, may be thereafter filed within ten days after the filing of said bill. Scheps v. Giles (Tex. Civ. App.) 222 S. W. 348; Kennedy Merc. Co. v. Western Union Telegraph Co. (Tex. Civ. App.) 167 S. W. 1094.

Be that as it may, the Commission of Appeals in Robbins et al. v. Wynne, 44 S.W.(2d) 946, 947, is a basis for the conclusion that improper argument need not always be objected to at the time it is made in order to preserve the right to present the objection in a motion for new trial and on appeal, citing Willis & Bro. v. McNeill, 57 Tex. 465. If it is not necessary to object to the improper argument when made and call the same to the attention of the court, then, of course, it would not be necessary to stop the argument, prepare a bill of exception, and, in the event the court did not approve it, procure bystanders for the purpose of converting it into a bystanders' bill.

So far as the record shows, Mr. Dupree was not supported by any facts in referring to banks at Plainview, Slaton, and Seminole, because it had not been shown that these banks had failed. We may reasonably infer from Judge Klett's objection to the reference to these banks that it was generally known in that district that the banks at the three towns mentioned had become insolvent and closed their doors, and it must be admitted that the statement of counsel as set out in any of the several bills of exception with reference to the right of depositors to take shotguns and butcher knives and call upon Herd was intemperate and inflammatory. The rule announced by the Commission of Appeals in Robbins v. Wynne, supra, is that, when counsel go outside the record to injure the other side or discuss matters not in the record, it is misconduct, which must result in a reversal, unless it clearly and affirmatively appears that no injury has been done. As said by Judge Critz in that case: "In other words, we hold that the same rule governs in such instances as governs where the jury itself is guilty of misconduct and hears evidence outside the record while it is deliberating on a verdict."

In that case Judge Critz reviews numerous decisions by the Supreme Court, Commission of Appeals, and other courts which emphasize and sustain his holding. He says: "In a case like this, where the issues are sharply drawn, and counsel goes outside the record and gives the jury hearsay testimony vital to the case, we do not think it can be said that the question of injury is free from doubt, or that the appellate courts are bound by the discretion of the trial court."

It is admitted by both parties that during the several trials of this case, and especially the last trial, the feeling was intense. Both the plaintiff and defendant were well represented by their partisan friends in, and the courtrooms were crowded during, each of the trials. For this reason, the use of intemperate language and reference to other bank failures by counsel in argument is highly prejudicial and requires a reversal.

As said in 3 Tex. Jur. 223, 224: "But according to recent authorities it appears that improper argument, injecting into the case matters dehors the record that are inflammatory and calculated to prejudice the rights of the losing party before the jury, may, in a proper case, be complained of on appeal although objection was urged for the first time in a motion for a new trial. It is apparent that in some cases efforts to withdraw remarks made by counsel can have no other effect than to accentuate their import upon the minds of the jury."

Reversed and remanded.